# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 26, 2018　　　　　Decided August 14, 2018

No. 17-1056

ABC AEROLINEAS, S.A. DE C.V., D/B/A INTERJET,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
RESPONDENT

———

Consolidated with 17-1115

———

On Petitions for Review of Final Orders of
the United States Department of Transportation

———

*Moffett B. Roller* argued the cause and filed the briefs for petitioner.

*Christopher S. Perry*, Acting Deputy Assistant General Counsel, U.S. Department of Transportation, argued the cause for respondent. With him on the brief were *Robert B. Nicholson* and *Frances Marshall*, Attorneys, U.S. Department of Justice, and *Paul M. Geier*, Assistant General Counsel.

Before: GARLAND, *Chief Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*:  As a condition of approving a cooperation agreement between two airlines, the Department of Transportation required those airlines to give competitors 24 pairs of their takeoff and landing slots at Mexico City's Benito Juárez International Airport.  The Department did not permit the airlines to give any of those slots to petitioner Interjet, because Interjet already had more than 300 slots at that airport.  Interjet challenges the Department's orders implementing this decision, contending that they were arbitrary, capricious, and contrary to law.  Because the Department's decision was reasonable and consistent with its statutory mandate, we deny Interjet's petitions for review.

I

The Federal Aviation Act, 49 U.S.C. § 40101 *et seq.*, tasks the United States Department of Transportation (DOT) with regulating the economic aspects of commercial air travel.  One of its many provisions, 49 U.S.C. § 41309, sets forth requirements for airlines seeking to cooperate with their competitors.  Under that provision, the Secretary of Transportation "shall approve" a cooperation agreement "when the Secretary finds it is not adverse to the public interest and is not in violation of this part." *Id.* § 41309(b).  The Secretary may not, however, approve any agreement that "substantially reduces or eliminates competition," unless she makes certain findings not relevant to this case.  *Id.* § 41309(b)(1).  If the Secretary approves a cooperation agreement, she may "exempt a person affected by the order from the antitrust laws," as necessary to allow the agreement to operate.  *Id.* § 41308(b).

The Federal Aviation Act also instructs DOT to consider numerous factors in deciding whether an agreement is in the

public interest. Several relate to the importance of competition: The Department must take into account "the availability of a variety of adequate, economic, efficient, and low-priced services"; must "plac[e] maximum reliance on competitive market forces and on actual and potential competition"; and must strive to "avoid[] unreasonable industry concentration, excessive market domination, monopoly powers, and other conditions that would tend to allow at least one air carrier or foreign air carrier unreasonably to increase prices, reduce services, or exclude competition in air transportation." *Id.* § 40101(a)(4), (6), (10).

This case arises out of an application for approval of a cooperation agreement filed by Delta Airlines and Aeromexico, Mexico's flag carrier. The airlines sought to "coordinate their respective passenger services on routes between the United States and Mexico." Joint Application for Approval of and Antitrust Immunity for Alliance Agreements 1 (Mar. 31, 2015) (J.A. 4). The airlines explained that, if the Department of Transportation approved the agreement and granted them antitrust immunity, they would implement "metal neutrality," meaning that each airline would treat the other's flights as if they were its own. *Id.* at 3 (J.A. 6). According to the airlines, such an arrangement would allow them to increase U.S.-Mexico air service. *Id.* 15-22 (J.A. 18-25).

Before deciding whether to approve the airlines' application, DOT requested public comments. Six other airlines, four airports, two nonprofits, and one city filed comments concerning the proposed agreement. In addition, the Department requested further information from the applicant airlines, as well as from various Mexican authorities.

After the public comment period closed, the Department filed an order that tentatively approved the agreement and

granted the applicants antitrust immunity. The Department concluded that, with certain conditions, the agreement would be in the public interest and would not substantially reduce or eliminate competition. Order to Show Cause 2 (Nov. 4, 2016) (J.A. 115). As relevant here, it proposed requiring the applicant airlines to divest 24 pairs of their takeoff and landing authorizations ("slots") at Mexico City's Benito Juárez International Airport (MEX), as well as six pairs of slots at New York City's John F. Kennedy International Airport (JFK). *Id.*[1] The Department explained that the "Joint Applicants control nearly 50% of the MEX slots, the allocation of which is dependent on confusing and often unwritten rules, making it extremely difficult for new entrants to launch competitive service." *Id.* at 1 (J.A. 114). The divestiture, the Department said, was "necessary to support new entry needed to discipline the coordinated services and planned growth of the joint venture." *Id.* at 21 (J.A. 134).

As part of its proposed remedy, DOT stated that it would determine which airlines were eligible for the divested slots. "[B]ecause the aim of the divestitures is to implement new competitive service," DOT determined that only carriers "with a limited presence, or no presence, at the respective airports" would be eligible to receive slots. *Id.* at 24 (J.A. 137). At MEX, this policy resulted in the exclusion of Interjet, which had 313 slots -- the second most after Aeromexico. At JFK, this policy resulted in the exclusion of JetBlue. *Id.* at 25 (J.A. 138). Finally, DOT determined that the divested slots would be "required to be deployed in the transborder market" -- that is, on U.S.-Mexico flights. *Id.*

---

[1] "A 'slot' is a time period allotted to an airline at a particular airport for taking off or landing." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 260 (2d Cir. 2001).

After another round of comments, including an objection from Interjet, the Department finalized its proposed order with minor modifications.[2] DOT's December 2016 Order rejected Interjet's argument that it should be eligible for MEX slots, reasoning that "Interjet has over 26% of the slots at MEX, more by far than any other carrier besides Aeromexico," and therefore that "Interjet does not need assistance to achieve competitive access at MEX; it already has it." December 2016 Order 23 (Dec. 14, 2016) (J.A. 256). Although Delta and Aeromexico filed a notice attacking DOT's conditions as "onerous," Notice of the Joint Applicants 1 (J.A. 273), they did not seek judicial review.

Thereafter, the Department began proceedings to direct, as a condition of approving the agreement, the applicants' divestiture of the slot-pairs at MEX and JFK to specific carriers. On April 10, 2017, after two additional rounds of public comment, the Department directed the divestiture of the 24 pairs of MEX slots to five airlines, excluding Interjet. (DOT directed the divestiture of the slot pairs at JFK to three airlines, excluding JetBlue but including Interjet.) The Department once again considered and rejected Interjet's objection that it should have received slots at MEX. *See* April 2017 Order 7-11 (Apr. 10, 2017) (J.A. 332-36).

## II

Interjet petitions for review of only a part of the orders that approved the Delta-Aeromexico cooperation agreement and directed the divestiture of the MEX and JFK slots. Interjet does not challenge the Department's decision to approve the cooperation agreement or to require slot divestitures. Nor does

---

[2] In the most relevant modification, DOT decreased the number of JFK slots it ordered divested from six pairs to four.

it challenge any part of the decision directing which carriers would receive the slots at JFK. Interjet's sole objection is to DOT's decision to exclude it from receiving MEX slots. That decision, it contends, was inconsistent with the Federal Aviation Act and was arbitrary and capricious. *See* Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (providing that "[t]he reviewing court shall . . . hold unlawful . . . agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

A

We begin with Interjet's contention that the Department's orders violated the Federal Aviation Act. In judging an agency's compliance with a statute that Congress has entrusted it to administer, we apply the familiar framework of *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 915 (D.C. Cir. 2017). Under that framework, "when the statute 'is silent or ambiguous,'" we must "defer to a reasonable construction" set forth by the agency. *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (quoting *Chevron*, 467 U.S. at 843).

According to Interjet, DOT lacks authority "to allocate divested slots at a foreign airport and to impose conditions on the use of those slots." Interjet Br. 45. Rather, the "Mexican government has exclusive authority over slot allocation at MEX." *Id.* at 31. But Interjet's argument has a faulty premise. As the Department's order explained, it "does not, and cannot, allocate slots at MEX." April 2017 Order 7 (J.A. 332). Instead, DOT simply "conditioned its discretionary grant of [antitrust immunity] on the Joint Applicants' divestiture of certain assets, as well as their transfer of those slots[,] . . . a condition that the Joint Applicants voluntarily accepted." *Id.* "If the Joint

Applicants do not obtain approval of the slot transfers" from the Mexican authorities, DOT continued, "then the Department's grant of [antitrust immunity] will simply not enter into force." *Id.*

Contrary to Interjet's claims, therefore, the Department did not attempt to assert authority over Mexico or any entity other than the applicants that were seeking DOT's approval of their cooperation agreement. As Interjet concedes, DOT plainly has the authority to "place *some* reasonable conditions" on a cooperation agreement. Interjet Br. 44.[3] Indeed, unsurprisingly, Interjet does not object to DOT's decision to exclude JetBlue but include Interjet itself in the divestiture order for JFK. Because, as discussed in Subpart II.B below, the conditions DOT imposed were consistent with the pro-competition interests expressly set forth in 49 U.S.C. § 40101, we conclude that DOT did not overstep its authority in imposing conditions on the MEX slots.

To the extent that Interjet further suggests that DOT lacks statutory authority merely because MEX is located in a foreign country, we also reject that claim. The Federal Aviation Act gives the Department broad authority to determine whether a cooperation agreement is in the "public interest." *See* 49 U.S.C. § 40101. And Interjet points to nothing in the Act's text or structure that would bar DOT from conditioning antitrust

---

[3] Courts have long recognized that, even without an "express statutory grant of power to impose conditions which will lessen the adverse impact" of consolidation, "such power is implicit as one necessary to the performance of [DOT's] duty to condition approval with due regard to terms which are just and reasonable in the interest of the public." *Kent v. Civil Aeronautics Bd.*, 204 F.2d 263, 265 (2d Cir. 1953); *cf. Nw. Airlines v. U.S. Dep't of Transp.*, 15 F.3d 1112, 1116, 1123 (D.C. Cir. 1994) (upholding DOT's decision to approve a route transfer "subject to certain conditions").

immunity on slot divestitures at MEX when needed to ensure competition on air routes between the United States and Mexico. Under the circumstances, it was reasonable for the Department to construe the statute as permitting it to impose such conditions.[4]

B

We next turn to Interjet's contention that DOT's orders were arbitrary and capricious. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). All that is required is that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Interjet's principal argument is that DOT did not explain why excluding it from slot eligibility served the pro-competition

---

[4] Interjet's briefs do not mention the presumption against extraterritoriality. In any event, that presumption would not provide Interjet any assistance. The presumption arises because courts assume that Congress is "primarily concerned with domestic conditions" in enacting laws. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (citation omitted). In this case, DOT's decision to ensure competition on routes between the United States and Mexico was concerned with domestic conditions. *Cf. Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) (noting that the Sherman Act's antitrust provisions apply "to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States" (citing, ironically, *United States v. Aluminum Co. of America*, 148 F.2d 416, 444 (2d Cir. 1945) -- the same Learned Hand opinion upon which Interjet relies for the argument we address in Part II.B)).

goals that animated the Department's orders. The Department, Interjet insists, never articulated any explanation for why "there would be greater transborder competition at MEX if Interjet remained ineligible to seek divested slots than there would be if Interjet were able to pursue and receive divested slots." Interjet Br. 14.

We disagree because the Department did in fact explain its decision:

> The MEX slot divestiture is designed to alleviate the immediate increase in concentration of slots, to reduce barriers to entry, and to support new entry by low-cost/low-fare carriers with a limited presence, or no presence at the airport. Based upon these objectives, the Department has appropriately tailored a remedy, and has exercised its discretion to limit eligibility to low-cost/low-fare carriers that are, in effect, new entrants or limited incumbents, and that could not launch substantial new services but for the remedy. Permitting Interjet to obtain the MEX remedy slots is totally at odds with those objectives. Given Interjet's status as the second-largest operator of slots at MEX by a wide margin, a different determination would worsen concentration at the airport and likely perpetuate the barriers to entry.

April 2017 Order 8 (J.A. 333) (internal quotation marks omitted). Sometimes a court must delve deeply into an agency's decisionmaking rationale to understand its basis. Here, however, the Department relied on basic, and common-sense, competition theory.

Interjet further argues that the Department did not have any data to support its assessment that Interjet already had sufficient

slots that it could use to serve the U.S.-Mexico market if it wished. That, too, is incorrect. In its order directing the divestiture of slots to specified carriers, DOT cited two data points in support of that assessment. First, the Department explained that "Interjet operates more than 25% of the slots at MEX." April 2017 Order 9 (J.A. 334). Second, the Department noted that "incumbents at MEX, including Interjet, do not use 37% of their slots on average." *Id.*[5] It was on this basis that the Department concluded that Interjet "already has a sufficient number of slots to serve the transborder market if it were profitable to do so." *Id.*

That reasoning supports DOT's view that "Interjet does not need assistance to achieve competitive access at MEX; it already has it." *Id.* at 6 (J.A. 331) (quoting December 2016 Order 23 (J.A. 256)). And it is consistent with Interjet's own DOT filing, which acknowledged that, "[i]n the coming months, Interjet is planning to continue the expansion of its service from Mexico City to new U.S. cities." Application of Interjet for Slot Allocation at John F. Kennedy International Airport 6 (Jan. 23, 2017) (J.A. 294). Accordingly, the Department articulated a rational connection between Interjet's existing slot holdings and the decision to exclude Interjet from receiving additional slots.

Interjet's ancillary arguments fare no better. It complains that DOT's decision was arbitrary because it excluded Interjet from slot eligibility while making eligible its competitor airlines Volaris and VivaAerobus. But this court is "generally unwilling to review line-drawing" performed by an agency, unless a

---

[5] This second finding applied to MEX slot-holders generally, not to Interjet in particular. But Interjet had an opportunity to submit evidence that its slot use differed from that of other incumbents, yet failed to do so. April 2017 Order 9 (J.A. 334); Recording of Oral Arg. 11:10-11:30, 29:55-31:30, 33:55-34:35.

"petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)). DOT explained that Interjet was already "the second-largest slot-holder at the airport . . . , with more than two-and-a-half times as many slots as its next closest competitor, Volaris." April 2017 Order 6 (J.A. 331). As of October 2016, Interjet had 313 slots and Volaris had 115. The closest eligible competitor after that, VivaAerobus, had only 64 slots. Order to Show Cause 24 (J.A. 137). Given that gulf, we can hardly describe the line the Department drew as patently unreasonable.

Interjet also asserts that DOT's orders erroneously stated that they were "compatible" with the remedy that the Mexican antitrust regulator, the Comisión Federal de Competencia Económica (COFECE), imposed in granting its own approval of the cooperation agreement. *See* December 2016 Order 28-29 (J.A. 261-62); Order to Show Cause 20 (J.A. 133). In fact, however, they were compatible. COFECE required Delta and Aeromexico to divest eight MEX slots, but it did not bar further divestitures. Nor did it place any conditions on which airlines could receive those slots. Thus, it was entirely possible for Delta and Aeromexico to comply with both regulators' remedies, and DOT did not err in viewing its remedy as consistent with COFECE's.

Finally, Interjet contends that the Department's action was arbitrary because it punished Interjet for its business success. Quoting a well-known admonition of Judge Learned Hand, Interjet declares that "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins." Interjet Br. 25 (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945)). But Interjet misunderstands

the statement it quotes. Judge Hand was analyzing a claim that Alcoa had unlawfully monopolized the aluminum market in violation of the Sherman Act, 15 U.S.C. § 2. A "strong argument can be made," he wrote, that "[a] single producer," who is "the survivor out of a group of active competitors, merely by virtue of his superior skill, foresight and industry" does not violate that Act. *Aluminum Co. of Am.*, 148 F.2d at 430.

In this case, the Department was not interpreting the Sherman Act, but rather applying the Federal Aviation Act. It was not seeking to determine how Interjet obtained its market position, whether by "superior skill" or by violating the antitrust laws; it was "merely tak[ing] that market position . . . into account in deciding that awarding Interjet additional slots would not further the interests of competition." April 2017 Order 9 (J.A. 334). Nor was the Department "punishing" Interjet. Rather, it was deciding on what conditions to grant a benefit -- antitrust immunity -- to Delta and Aeromexico. And it was doing so pursuant to a statute that instructs the Department, in deciding whether to confer immunity, to take into account "the availability of a variety of adequate, economic, efficient, and low-priced services"; to "plac[e] maximum reliance on competitive market forces and on actual and potential competition"; and to "*avoid[] unreasonable industry concentration, excessive market domination, [and] monopoly powers.*" 49 U.S.C. § 40101(a)(4), (6), (10) (emphasis added). In this context, Judge Hand's admonition is simply inapt.

III

For the foregoing reasons, we hold that the Department of Transportation's orders were neither contrary to the Federal

13

Aviation Act nor arbitrary and capricious. Accordingly, Interjet's petitions for review are

*Denied.*